Filed 3/6/13  Lobel  Financial v. Baltazar CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOBEL FINANCIAL CORPORATION,<br><br>    Plaintiff, Cross-defendant, and Respondent,<br><br>           v.<br><br>LUIS BALTAZAR et al.,<br><br>    Defendants, Cross-complainants, and Appellants. | G046119<br><br>(Super. Ct. No. 30-2008-00225258)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David R. Chaffee, Judge.  Affirmed.

Law Offices of Bruce Adelstein and Bruce Adelstein for Defendants, Cross-complainants, and Appellants.

Gary Dean Lobel and Ronald J. Green, Jr., for Plaintiff, Cross-defendant, and Respondent.

Luis Baltazar and his wife, Marisol Chavez, doing business as Affordable Auto Wholesales (hereafter collectively referred to in the singular as Affordable Auto unless the context indicates otherwise), appeal from an $8,730.73 judgment in favor of Lobel Financial Corporation (Lobel). Affordable Auto, a used car dealership, sold a customer's finance contract to Lobel. When the customer defaulted, Affordable Auto refused to repurchase the contract. On appeal, Affordable Auto contends the trial court erred by enforcing the recourse provision in Affordable Auto's written agreement with Lobel. We find no error and affirm the judgment.

FACTS AND PROCEDURE

Affordable Auto sells used cars, and in turn it sells its customers' finance contracts to independent finance companies, such as Lobel. On May 28, 2003, Baltazar and Chavez, on behalf of Affordable Auto, signed a form "Dealer Agreement (with limited repurchase obligation)" (hereafter the Dealer Agreement) setting forth terms on which Affordable Auto (designated as "Dealer" in the Dealer Agreement) would sell finance contracts to Lobel (designated as "Company" in the Dealer Agreement). Paragraph 1 of the Dealer Agreement provided in relevant part, "The contracts will be assigned with full recourse" and paragraph 10 provided, "The Dealer will repurchase all contracts that default in the first three (3) payments of the contract term . . . ."

The Dealer Agreement described a reserve account (Reserve Account) that Lobel internally maintained for each dealer from which a dealer could additionally profit if the dealer's customers, as a group, honored their payment obligations and paid off their loans. Paragraph 4 of the Dealer Agreement provided in full: "The Company will withhold a percentage on each contract purchased from the Dealer and credit that amount to the Reserve Account. It is the intent of the parties that the funds in the Reserve Account shall be accumulated to an amount equal to [30 percent] of the gross aggregate outstanding balance due on all contracts purchased by the Company hereinafter referred to as the

2

Minimum Reserve Requirement. When determining whether the Minimum Reserve Requirement is satisfied the Company will deduct from the balance of the Reserve Account any amounts owing to the Company by the [vehicle purchasers] and the Dealer, including, without limitation, amounts owing for contracts which the Dealer is required to repurchase under the agreement."

Paragraph 5 of the Dealer Agreement provided "the Company may set off or charge against the Reserve Account any and all indebtedness owed for any reason by the Dealer to the Company. . . . Refunds from the Reserve Account will be paid to the Dealer only to the extent that the amount of said Reserve Account exceeds the Minimum Reserve Requirement . . . ."

Paragraph 7 of the Dealer Agreement provided: "The Dealer understands and agrees that the Dealer has no present proprietary or possessory interest in the Reserve Account. The Dealer must claim the reserve within five years from the date that the last contract was purchased by the Company. . . . Should the Dealer fail to repurchase any contracts [or otherwise breach the Dealer Agreement] the entire Reserve Account will become the property of the Company."

Paragraph 10 of the Dealer Agreement provided: "The Dealer will repurchase all contracts that default in the first three (3) payments of the contract term, whether or not the . . . vehicle was repossessed. Any losses sustained after three (3) payments shall be charged against the Reserve Account only. The Dealer's liability shall be limited to the funds in the Reserve Account. . . . If the Dealer fails to repurchase a contract due for repurchase the Company may take the proceeds from the Reserve Account. . . . The obligations of the Dealer to repurchase contracts from the Company shall not be in any manner dependent upon or related to the balance in the Reserve Account."

*Bad Debt Election Form*

At the same time they executed the Dealer Agreement, Affordable Auto and Lobel also executed a document titled "Bad Debt Election Form." It provided in relevant

3

part, "California Sales and Use Tax Regulation 1642 allows the retailer [i.e., Affordable Auto] or the lender [i.e., Lobel] to claim a deduction or refund for bad debt losses from account(s) held by the lender without recourse. The retailer and the lender must file an election with the [Franchise Tax] Board designating which of them may claim the deduction or refund. This election will assign those rights to the lender as outlined below. . . . By signing this election, both parties agree to the following: [¶] 1. The retailer relinquishes all rights to the account to the lender. [¶] 2. The lender is entitled to claim any (and all) deduction or refunds as a result of any bad debt losses charged off by the lender for the accounts covered by this election as of 10-1-99 and forward. The retailer relinquishes all rights to claiming such deduction or refunds. [¶] 3. This election is a blanket election for all accounts assigned without recourse by the retailer to the lender or all accounts held by the lender without recourse pursuant to the lender's contract directly with the retailer."

*Parties' Course of Dealing*

Over the course of their business relationship, from 2003 through 2008, Lobel bought 481 finance contracts from Affordable Auto. During that time, 53 contracts went into default during the three-month recourse period and each time Affordable Auto repurchased the contract. Also during that time, Lobel sent Affordable Auto monthly statements detailing the amounts it had credited to and debited from the Reserve Account. On two occasions, Lobel sent Affordable Auto a check for $1,000 from the Reserve Account.

*Chaidez Contract*

In February 2008, Affordable Auto sold a used car to Eduardo Chaidez. The amount financed was $9,389.84, payable in monthly installments of $356.46 for 36 months. Affordable Auto sold the finance contract to Lobel. The assignment invoice reflected a 25 percent reserve amount ($2,347) would be deducted from the total financed amount (plus a $150 document fee), Affordable Auto was to receive a check for $6,892.39 from Lobel (which it received on March 3, 2008), and there would be a three payment repurchase period

4

(i.e., Affordable Auto had to repurchase the contract if Chaidez defaulted in the first three payments). Chaidez defaulted after the second payment. Lobel repossessed the vehicle and demanded that Affordable Auto repurchase the contract, but Affordable Auto refused. Lobel eventually sold the vehicle at auction for $3,703, leaving a balance due on the contract of $6,765.86.

*Complaint & Cross-complaint*

Lobel filed a complaint against Affordable Auto seeking to recover damages of $6,765.68, plus interest, for Affordable Auto's refusal to repurchase the Chaidez contract. Affordable Auto filed a cross-complaint alleging numerous causes of action primarily relating to the Reserve Account and requesting an accounting. The cross-complaint also contained a cause of action under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.). It alleged Lobel engaged in deceptive business practices by entering into the Dealer Agreement with Affordable Auto, which provided that customer contracts were purchased *with recourse* against Affordable Auto, but then executing a Bad Debt Election Form stating finance contracts were assigned *without recourse*, which thus might have allowed Lobel to collect sales tax refunds on bad debts when Affordable Auto should have been entitled to the refund. The matter proceeded to a bench trial.

*Trial Testimony*

Joseph Hernandez was Lobel's dealer services manager. Hernandez testified that when Lobel buys a finance contract, it is essentially buying the right to receive payment from the buyer of the vehicle. He testified the Dealer Agreement and documents relating to the Chaidez contract required Affordable Auto to repurchase the contract if Chaidez defaulted in the first three payments. Lobel paid Affordable Auto $6,892.39 for the Chaidez contract, the total value of the Chaidez contract to Lobel was $12,832.56 (i.e., that was the total of the payments—principal and interest—Chaidez should have made to Lobel under the contract), Chaidez defaulted after the second payment, the car was repossessed July 7, 2008, sold at auction for $3,703, and Affordable Auto did not repurchase the contract.

5

Lobel charged off a $6,765.86 loss against the Reserve Account. Hernandez testified Chavez called him about Lobel's repurchase demand, asking for the repurchase balance due. Chavez said she would call him back but never did. The Chaidez contract was the only contract Affordable Auto refused to repurchase.

Hernandez explained Lobel had two programs under which it bought finance contracts from car dealers, including Affordable Auto: a discount program and a reserve program. Under the discount program, Lobel would pay a discounted price for the contract and no amount of money would go into a reserve. The Dealer Agreement with Affordable Auto covered Lobel's reserve program, not the discount program. Under the reserve program, Lobel would withhold a percentage, which varied between 20 and 30 percent depending on the risk involved with the particular transaction. The reserve percentage was credited to the dealer's Reserve Account. The total in the Reserve Account always had to be equal to 30 percent of all of the dealer's outstanding loans before the dealer could get any kind of payout from the Reserve Account. Any bad loans from the dealer that were not repurchased by the dealer reduced the value of the dealer's Reserve Account.

Hernandez explained the amount Lobel withholds on a particular finance contract would be noted on the approval form it sends to the dealer when it agrees to buy that contract. In the case of the Chaidez contract, the approval form showed Lobel withheld 25 percent for the Reserve Account. The amount of the reserve could be negotiated and often was. Although a less than 30 percent reserve made it harder for the dealer's Reserve Account to ever get to the minimum 30 percent balance to permit any payout, the dealers usually wanted more money upfront for the finance contracts they were selling. Lobel gave dealers a monthly accounting of the Reserve Account. By the time of trial in August 2011, Affordable Auto's Reserve Account was "upside down" by $17,000.

Hernandez explained the Bad Debt Election Form was a form that could be filed with the State Board of Equalization in a *nonrecourse* assignment to allow Lobel to get

6

a refund of sales tax if the customer defaulted. To Hernandez's knowledge, Lobel never collected sales tax refund on bad debts from Affordable Auto contracts. The Bad Debt Election Form only had relevance if the assignment was held without recourse. Hernandez was unsure if Lobel ever took assignments of finance contracts from Affordable Auto without recourse—but thought perhaps one or two contracts were funded that way over the years.

Baltazar and his wife, Chavez, both testified Affordable Auto did not repurchase the Chaidez contract because of a dispute over the amount it owed Lobel. (However, Chavez also testified she refused to repurchase the Chaidez contract because she thought the Bad Debt Election Form made all Affordable Auto finance contracts assigned to Lobel nonrecourse assignments.) Baltazar and Chavez testified Affordable Auto regularly repurchased financed contracts from Lobel and other finance companies. They both understood Affordable Auto was contractually obligated to repurchase a finance contract that went into default during the three-month recourse period. The recourse requirement in Lobel's Dealer Agreement was similar to what other finance companies required. This was the only time Affordable Auto did not honor its repurchase obligation.

Baltazar and Chavez both testified as to their understanding of how the Reserve Account was supposed to work. On any contract assigned to Lobel, Lobel was suppose to give Affordable Auto 70 percent of the financed amount immediately and put the other 30 percent in the Reserve Account. Affordable Auto was supposed to get the remaining 30 percent for each finance contract when the customer paid off the car loan. But Hernandez agreed from 2003 to 2008 Affordable Auto only ever received two checks for $1,000 each from the Reserve Account, the checks did not identify any specific contract (car loans) they represented, they just said "Reserve Program" on them, and Affordable Auto received monthly statements of the Reserve Account. Baltazar and Chavez both understood that Lobel could charge off any bad debts against the Reserve Account. Chavez

7

testified she understood the Reserve Account was not tracked by each contract sold to Lobel, rather it was one big pool.

Chavez testified that when a buyer defaulted during the recourse period and the car was repossessed, Affordable Auto normally received a notice of intent to dispose of collateral and Affordable Auto could get the vehicle back. Affordable Auto did not receive such a notice from Lobel with regards to the Chaidez vehicle.

In closing argument, Affordable Auto argued the Bad Debt Election Form and the Dealer Agreement should be interpreted together as providing that all finance contracts assigned to Lobel were without recourse. No statement of decision was requested and none was issued by the trial court. In ruling, the trial court orally explained Lobel's use of a three-month recourse period and the Reserve Account were completely reasonable methods of securing performance of the finance contracts by Affordable Auto's customers—"I don't see anything inherently wrong or in violation of some standard of business or law in the State of California." The court observed that Affordable Auto presented no evidence Lobel misappropriated or improperly withheld any of the money in the Reserve Account. It would have taken a forensic accountant to demonstrate any improprieties and Affordable Auto offered no expert testimony or accounting documents. The court entered judgment for Lobel on its complaint in the principal amount of $6,765.86, plus $1,964.87 in interest, and for Lobel on Affordable Auto's cross-complaint. The court denied Affordable Auto's motion for new trial.

DISCUSSION

A. *Judgment on Lobel's Complaint*

Affordable Auto contends the judgment awarding Lobel damages on its complaint must be reversed because the trial court erroneously interpreted the Dealer Agreement as providing the Chaidez contract was assigned to Lobel *with recourse*. Affordable Auto asserts that when the Dealer Agreement and the Bad Debt Election Form are read together, there is an obvious conflict between them—with one providing there is

8

recourse and one providing there is not—and the only way to reconcile that conflict is to interpret all assignments as being without recourse. The argument is without merit.

"'The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract.' [Citation.] 'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible.' [Citations.] '"We consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation."' [Citation.] When the language of the instrument is unambiguous, we determine the parties' intent solely by reference to that language. [Citations.]" (*PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 145-146; see also *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955-956.) We review the interpretation of a contract de novo unless the interpretation turns on the credibility of extrinsic evidence. (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)

Affordable Auto argues the Dealer Agreement and the Bad Debt Election Form must be construed as one contract under Civil Code section 1642, which provides that "several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together[,]" because the two documents were executed at the same time and both pertain to Lobel's purchase of finance contracts from Affordable Auto. (See, e.g., *Vons Companies v. Lyle Parks, Jr., Inc.* (2009) 177 Cal.App.4th 823, 834.) Lobel agrees the documents should be considered together. Although we do not quarrel with that proposition, it does not aid Affordable Auto because there is no conflict between the provisions of the two documents.

It is a fundamental rule of contract interpretation that "[c]ontradictory or inconsistent provisions of a contract are to be reconciled by interpreting the language in such a manner that will give effect to the entire contract. (Civ. Code, §§ 1641, 1652; *Siligo v. Castellucci* (1994) 21 Cal.App.4th 873, 880-881 . . . .) A contract term should not

9

be construed to render some of its provisions meaningless or irrelevant. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 827-828 . . . .)" (*Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1753-1754, fn. 4.) Additionally, "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.)

The gist of Affordable Auto's argument is the Dealer Agreement provides for the assignment of contracts to Lobel *with* recourse but the Bad Debt Election Form states the assignments are *without recourse*, thus allowing Lobel to claim sales tax refunds on bad debts. Affordable Auto argues the existence of the Reserve Account against which Lobel can charge defaulting Affordable Auto loans *after* the three-month recourse period has expired in effect means *all* contract assignments are recourse assignments. Affordable Auto argues that because Lobel can debit bad loans against the Reserve Account, Affordable Auto alone bears the risk of defaults on its customers' finance contracts. Accordingly, Affordable Auto reasons, to avoid an interpretation of the Bad Debt Election Form that renders it at best meaningless (i.e., if assignments are made *with recourse*, then Bad Debt Election Form serves no purpose), or at worst illegal (i.e., the Bad Debt Election Form allows Lobel to fraudulently claim sales tax refunds on bad debts to which it is not entitled because the account is held with recourse), we must interpret the two contracts together as providing that all assignments of contracts to Lobel are made without recourse.

Preliminarily, we do not agree with Affordable Auto's premise that the existence of the Reserve Account means *all* finance contracts Lobel acquired from Affordable Auto are held with recourse to Affordable Auto for payment in the event of default. Affordable Auto points out that "recourse" generally means having resort to other property of the seller to meet the repayment obligation. (See, e.g., *Cook v. Superior Court* (1936) 12 Cal.App.2d 608, 613.) But the Dealer Agreement specifically states, "The Dealer understands and agrees that *the Dealer has no present proprietary or possessory interest in*

10

*the Reserve Account.*" (Italics added.) Affordable Auto is only entitled to payment from the Reserve Account Reserve when the Reserve Account exceeds 30 percent of the total of *all* of its customers' outstanding finance contracts after deducting from the Reserve Account any amounts Lobel has to write off for bad debts from Affordable Auto's customers. It is correct to say the Reserve Account gives Lobel added security when purchasing Affordable Auto's finance contracts—as the trial court observed, Affordable Auto's potential to eventually receive a payout from the Reserve Account gives it an extra incentive to make sure its customer base *as a whole* has been adequately vetted as to the ability to make car payments. But there certainly comes a point at which even the Reserve Account is meaningless as added security—indeed, the only evidence in the record is that by the time of trial Affordable Auto's Reserve Account was in the red by $17,000, meaning Lobel now has no recourse against Affordable Auto for any remaining outstanding Affordable Auto acquired loans that go into default. Thus, Affordable Auto's claim that it alone bears the risk of bad loans is false.

Moreover, even if the Reserve Account is a form of recourse, there simply is no merit to Affordable Auto's contention the Dealer Agreement and the Bad Debt Election Form conflict. The Bad Debt Election Form is a document required by California Code of Regulations, title 18, section 1642, which allows an income tax deduction for or refund of sales tax that was paid by a retailer in relation to what eventually has became a bad debt. If the account was assigned by the retailer to a lender, and the lender holds the debt without recourse, either the retailer or the lender (but not both) can claim the refund or deduction. "In order for the retailer or the lender to claim a deduction or refund for bad debt losses *from an account held by the lender without recourse*, the retailer and the lender must file an election with the [Franchise Tax] Board designating which of them may claim such deduction or refund." (Cal. Code Regs., tit. 18, § 1642, subd. (i)(3)(A), italics added.) The written election must contain specified information and include "[a] list of accounts to which the election pertains. If the election is a blanket election for all accounts assigned

11

without recourse by the retailer to the lender or all accounts held by the lender without recourse pursuant to the lender's contract directly with the retailer, the election must so state." (Cal. Code Regs., tit. 18, § 1642, subd. (i)(3)(A)(4).)

Here, the Bad Debt Election Form states it is a blanket election that Lobel is entitled to claim the sales tax deduction or refund for "*all accounts assigned without recourse* by the retailer to the lender *or all accounts held by the lender without recourse . . . .*" (Italics added.) It does not state that *all* contracts assigned to Lobel by Affordable Auto are assigned or held *without* recourse. On its face, the Bad Debt Election Form provides only that *if* an account was assigned without recourse, or is held without recourse, then Lobel may claim the sales tax refund. The Bad Debt Election Form only has relevance when there no longer is recourse on a debt. It does not constitute an agreement or a representation to the Franchise Tax Board that *all* accounts bought by Lobel from Affordable Auto are without recourse, only that when there is no recourse on a bad debt, Lobel and not Affordable Auto gets to claim the sales tax deduction or refund.

Moreover, there is no evidence suggesting the parties gave the Bad Debt Election Form any different interpretation than the one that is plain on its face. Hernandez testified that perhaps once or twice over the years Lobel bought a contract from Affordable Auto without recourse, but there was no evidence those contracts ever went into default. And there was no evidence Lobel construed the Bad Debt Election Form as permitting it to claim a sales tax refund on Affordable Auto contracts that were held *with* recourse. Indeed, the only evidence at trial was Hernandez's testimony that to his knowledge Lobel has never sought a sales tax refund on any bad debt from one of Affordable Auto's contracts. Thus, Affordable Auto's premise, that the Dealer Agreement and Bad Debt Election Form are in irreconcilable conflict, is a faulty one.

Having concluded there is no conflict between the Dealer Agreement and the Bad Debt Election Form, the breach of contract judgment against Affordable Auto must be affirmed. The Dealer Agreement provided for a three-month recourse period during which

12

Affordable Auto was obligated to repurchase the Chaidez contract if it went into default, and it is undisputed Chaidez defaulted within that recourse period. Baltazar and Chavez both testified they understood the repurchase requirement, and the evidence was uncontroverted that on 53 occasions Affordable Auto honored its repurchase obligation. Baltazar and Chavez both testified Affordable Auto refused to repurchase the Chaidez contract because of disputes over the amount owed. Lobel presented evidence the repurchase amount was $6,765.86, and Affordable Auto presented no evidence to the contrary.

B. *Judgment on the Cross-Complaint*

We need only briefly address Affordable Auto's arguments pertaining to its cross-complaint.

First, Affordable Auto asserts that because the Dealer Agreement and Bad Debt Election Form must be interpreted as providing that *all* contracts Affordable Auto sold to Lobel over the years were sold and held by Lobel *without* recourse, then any bad debts Lobel charged against the Reserve Account was done in breach of the Dealer Agreement. Affordable Auto acknowledges it presented no evidence as the amounts so charged. Inasmuch as we have already determined that Affordable Auto's premise is wrong—there is no conflict between the Dealer Agreement and the Bad Debt Election Form—we reject its contention.

Affordable Auto also contends it demonstrated as a matter of law that Lobel engages in an unfair and deceptive business practice in violation of the UCL by including in its Dealer Agreement a provision that contracts are assigned *with* recourse, but then taking the position the Bad Debt Election Form permits it to claim sales tax refunds on contracts it holds *without* recourse. Affordable Auto contends Lobel essentially has positioned itself to be able to claim sales tax refunds for bad debt write-offs to which it is not entitled. For reasons already discussed, Affordable Auto's premise is wrong—there is no conflict between the documents. Affordable Auto has failed to demonstrate Lobel has engaged in

13

any an unfair and deceptive business practices. Moreover, even were there any merit to the premise of Affordable Auto's argument, its UCL cause of action fails for a more fundamental reason. To prevail on a UCL claim, a plaintiff must prove he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.) Thus, the plaintiff must establish both injury in fact and "some form of economic injury" that has a causal connection to the unfair competition. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 323, 326.) Affordable Auto concedes there is absolutely no evidence Lobel has ever sought a sales tax refund based on *any* bad debt write off, let alone one arising from an account it purchased from Affordable Auto. Affordable Auto's failure to demonstrate it suffered any injury in fact from the allege unfair business practice is fatal to its UCL claim.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


THOMPSON, J.

14